131 So.2d 635 (1961)
CHICAGO MILL AND LUMBER COMPANY, Plaintiff-Appellant,
v.
AYER TIMBER COMPANY, Inc., et al., Defendants-Appellees.
No. 9419.
Court of Appeal of Louisiana, Second Circuit.
March 10, 1961.
Dissenting Opinion March 24, 1961.
On Rehearing June 16, 1961.
Rehearing Denied July 7, 1961.
*637 Wilkinson, Lewis, Madison & Woods, Shreveport, for appellant.
Simon, Carroll, Fitzgerald & Fraser, Shreveport, for Ayer Timber Co., Inc.
J. Carter Perkins, Alvin B. Gibson, Geo. C. Schoenberger, Jr., New Orleans, for Shell Oil Co.
Phillips, Risinger & Kennedy, Shreveport, and Burton Wade, St. Joseph, for David C. Tyrrell, J. N. Barineau, Jr., Francis W. Scott, Milton Crow, Inc., and Austin E. Stewart.
BOLIN, Judge.
Plaintiff filed suit against Ayer Timber Company, Inc., to have mineral reservation held by them on lands in Tensas and Madison Parishes, Louisiana, declared extinguished by ten year liberative prescription and that plaintiff, as present owner of the lands, be declared the owner of all minerals under said lands. Plaintiff also prayed that certain oil and gas leases held by the defendants, Shell Oil Co., Francis W. Scott, David C. Tyrrell, J. N. Barineau, Jr., Austin E. Stewart and Milton Crow, Inc. be cancelled from the public records; and that an accounting be made for all oil and gas produced under the leases. All defendants filed exceptions of no right and cause of action which were sustained by the trial judge. From such judgment, plaintiff has perfected this appeal.
As this matter is before us on the exceptions above set forth, the allegations of ultimate fact in the petition of appellant must be accepted as true. It was alleged that Ayer Timber Company was, at one time, a large landowner in Madison and Tensas Parishes; that it desired to divest itself of its land holdings but wished to retain the minerals thereunder for as long as possible; that in furtherance of its desires, Ayer Timber Co. executed certain instruments to plaintiff's authors in title denominated "Lease with Option to Purchase"; that these "leases" were for terms of five years and granted the "lessees" therein the right to purchase the lands for certain stated considerations; that the so-called leases contained reservations of oil, gas and other minerals in favor of Ayer Timber Co., as did the subsequent instruments denominated "deeds" obtained pursuant to the terms of the original option. Plaintiff also alleged that the rental under the leases to the one-third of the total consideration for the lease and transfer of title.
Further allegations recite that the basis of plaintiff's claim is the intent of Ayer Timber Co., to devise a method to extend the life of a mineral servitude and thus, to circumvent the law of the State and the public policy thereof relative to the life of mineral servitudes. Paragraph VI of the petition reads:
"At the respective dates of execution of the instruments styled `Lease with Option to Purchase' referred to in *638 paragraphs 2(a), (b), (c) and (d) as Exhibits `P-1', `P-3', `P-5', `P-6', and `P-9', it was the intention of the parties to said instruments in executing same that the so-called lessee was in reality the vendee rather than lessee of the property described in said instruments, and that said instruments were styled as such in an attempt to allow the vendor, Ayer Timber Company, Inc., to reserve the mineral rights for a period in excess of ten years." (Emphasis ours.)
Paragraph VII of the petition reads:
"In executing each of the instruments styled `Lease With Option To Purchase' referred to in paragraphs 2(2), (b), (c) and (d) as Exhibits `P-1', `P-3', `P-5', `P-6' and `P-9', it was the purpose and intention of Ayer Timber Company, Inc., to obtain such a large proportion of the purchase price for the so-called rental period, that the purchaser, as a practical matter, would be forced to pay the balance due on the purchase price; and this type of instrument was used for the sole and only purpose of putting the purchaser in a position where, from an economic standpoint, he would be required to consummate the purchase and yet Ayer Timber Company, Inc., would have fifteen, rather than ten years within which to develop the minerals in the respective tracts; and the sole reason for employing this type of instrument was to put into effect a scheme devised by Ayer Timber Company, Inc., to circumvent the Louisiana law relative to the ten-year liberative prescription of minerals servitudes for non-usage as provided in Article 789 of the [LSA-] Civil Code of Louisiana and to thwart and evade the law contrary to the well-recognized and accepted public policy of the State of Louisiana as announced in many decisions of the Supreme Court of Louisiana as well as the Federal and other courts of this State."
Allegations of circumstances surrounding the execution of the instruments were also contained in plaintiff's petition as follows:
A. The lessor reserved the minerals.
B. The property leased was worthless for all practical purposes during the term of five years.
C. The "lease" made no provisions as to the use to be made of the lands under "lease".
D. The amount of "rent" paid in the five year term was one-third of the total price required to obtain title.
E. The consideration for the "lease" bound the "lessee" to execute the option to purchase as a matter of practical economics.
F. Identical transactions with others show the purpose the Timber Co. sought to accomplish, that is, circumvention of the ten year liberative prescription period applicable to servitudes.
Plaintiff further alleged that Ayer Timber Co. executed two oil and gas leases affecting the property and that it believes production has been obtained on the tract within ten years from the date of the transfer of title under the option but more than ten years from the date of execution of the original instruments.
As we appreciate this case, we have two issues involved, which may be briefly stated as follows:
1. Has the plaintiff alleged sufficient facts to entitle it to a trial on the merits in an effort to show that Ayer Timber Company, Inc., has attempted to extend a mineral servitude beyond the prescriptive period of ten years and thereby circumvent the well established public policy of this state?
2. In the event the instrument in question is set aside as being such an *639 effort to circumvent our laws, do the oil and gas leases affecting the property also become a nullity or are such lessees protected as innocent third parties under the laws of registry?
If there is anything that seems to be well established in our jurisprudence, it is that any instrument which attempts to extend a mineral servitude beyond the prescriptive period set forth in our codal articles will be declared a nullity by our courts, if such fact is properly presented and established. Therefore, the only question presented herein is whether the plaintiff has alleged sufficient facts in its petition, which if proven by it on a trial, would show that the defendant, Ayer Timber Company was attempting to extend such mineral servitude in contravention of our public policy. In connection with this problem, we must admit that our examination of the briefs of counsel representing the litigants, as well as our independent research of the jurisprudence, leads us to the conclusion that the exact factual situation herein has never been decided by our Appellate Courts. In order to arrive at some decision on these facts, we feel it appropriate to briefly comment upon the holdings of other Louisiana cases that have enunciated general rules wherein similar instruments were nullified as being contrary to such public policy.
The landmark case of Frost-Johnson Lumber Co. v. Salling's Heirs, 1922, 150 La. 756, 91 So. 207, 239, is generally regarded as the original decision of our Supreme Court establishing the paramount rule of Louisiana mineral law that a mineral sale or reservation does not create a separate mineral estate, but only a right in the nature of a servitude subject to the liberative prescription of ten years. If restrictions had not been so imposed on the right to hold minerals out of commerce, as Justice O'Niell stated:
"* * * it would recognize a species of perpetual incumbrance upon real estate which has never yet found an abiding place in our civil law system."
Six years before the Salling's Heirs case, supra, the Court in Bristo v. Christine Oil & Gas Co., 1916, 139 La. 312, 71 So. 521, struck down as being null a contract purporting to give a perpetual option to hold land under a mineral lease, on the ground that it:
"* * * would take the property out of commerce, and would be violative of the doctrine of ownership, defined in the second title of the second book of the Civil Code." 139 La. 315, 71 So. 522.
In the recent case of Gueno v. Medlenka, 1960, 238 La. 1081, 117 So.2d 817, the Supreme Court restated the basic principle as follows:
"* * * it is contrary to the public policy of this State to hold property out of commerce and this Court has consistently applied the liberative prescription of ten years in dealing with the exercise of mineral rights." 238 La. 1101, 117 So.2d 824.
It is clear from the Salling's Heirs case, and later decisions, that Louisiana public policy is directed against the withdrawal of valuable property rights from commerce.
In the early period of judicial development of Louisiana's mineral laws, the efforts by the landowners to extend the life of the mineral servitude were by means of direct stipulations in the instrument. The first of these was an agreement between the landowner and the mineral owner that the minerals were reserved for a period in excess of ten years. Such provisions, being contrary to our public policy, were declared a nullity on the ground that prescription could not be renounced before it accrued. Bodcaw Lumber Co. of Louisiana v. Magnolia Petroleum Co., 1929, 167 La. 847, 120 So. 389.
In Union Producing Co. v. Parkes, D.C W.D.La.1940, 40 F.Supp. 163, a Federal *640 Court upheld our public policy by declaring a provision giving the purchaser of minerals 30 years to develop same void as an attempt to circumvent the Louisiana law of liberative prescription.
Since it became increasingly clear that no direct contractual efforts to circumvent our public policy relating to prescription of mineral servitudes would be allowed, a resort was made to indirect attempts, carefully concealed in instruments which were valid on their face, but the underlying purpose being to defeat such public policy.
It was maintained that the reservation of a royalty rather than a mineral interest would not fall within the legal category of "servitude" subject to the prescriptive period. The Supreme Court, however, in Vincent v. Bullock, 1939, 192 La. 1, 187 So. 35, held that the interest reserved prescribed in ten years, it being immaterial what term was used in characterizing the interest.
Another effort was made by classifying the mineral owner as an agent, thus creating a mandate coupled with an interest, which effort was unsuccessful. Childs v. Porter-Wadley Lumber Co., 1938, 190 La. 308, 182 So. 516.
A device was also used whereby undivided interests in outstanding minerals were conveyed to minors in the hope of suspending the running of the prescriptive period. The court again upheld the public policy of the state by holding that any conveyance to a minor for the purpose of suspending prescription would not be recognized. Patton's Heirs v. Moseley, 1937, 186 La. 1088, 1094-1095, 173 So. 772, 774, 775.
In Roy O. Martin Lumber Co. v. Hodge-Hunt Lumber Co., 1938, 190 La. 84, 88, 89-90, 181 So. 865, 866, 867 the Court condemned the use of an instrument vesting title in minors, valid on its face, to circumvent the law.
Still another scheme was a contractual provision taking effect after the ten-year prescriptive period would ordinarily have passed. In Ober v. McGinty, La.App. 2 Cir., 1953, 66 So.2d 385, 386, a deed conveying land contained a clause giving the vendor the right to extend his ownership to the minerals, which he reserved for an additional ten year period by paying a stated price. When the vendor sued to exercise the right to purchase, his case was dismissed on an exception of no cause of action, the court holding:
"It is obvious that Ober had in mind at the time he made this sale, avoidance of or escape from the effects of the law of prescription as applied to mineral servitudes, and this is clearly an effort to establish a servitude for a longer period than ten years."
A vendor of land, who desired to recover mineral interest outstanding at the time of the sale of the realty, stipulated in the contract of sale that when the outstanding minerals prescribed, they would revert to the vendor of the land. When confronted with this situation, the Louisiana Supreme Court held in Hicks v. Clark, 1954, 225 La. 133, 141, 72 So.2d 322, 325, the right of reversion to be a nullity, stating:

"We consider the reservation of the reversionary interest in this case as an effort to circumvent the public policy of this state, and we therefore refuse to recognize or give effect to it." (Emphasis added.)
Almost every device conceivable has been employed in an attempt to circumvent our law on this question. In every instance where the Supreme Court has found such an intent it has zealously protected the State's public policy. This vigilance of the Supreme Court has curtailed the attempts of those who seek to withhold mineral rights from commerce beyond the prescriptive period.
We could cite and analyze many other cases wherein this matter has been before our Appellate Courts, but we do not feel they would add to this decision. We have only briefly discussed the holdings in the cases cited in order to show the definite trend of our courts on this question. We feel that the case of Ober v. Williams, 1948, *641 213 La. 568, 35 So.2d 219, 224, is the case most appropriate to the factual situation herein. This case has been cited by counsel for all litigants herein, and it has been argued that its holding and dicta supports the position of both the plaintiff and the defendants. We feel that we should, therefore, briefly discuss the case. The contract involved therein was an option to buy forty acres of land within one year. The purchaser bought the land at the end of the option period but the vendor reserved one-half of the minerals. The contention was made that title was vested in the vendee retrospectively as of the date of the original option contract so as to start the running of the prescriptive period against the mineral servitude reserved in the deed. The court held that the prescription did not begin to run until the title was actually vested in the vendee, but in connection with its decision, the court had this to say:
"Finally, plaintiff and amici curiae have expressed great concern respecting the result in this case. Amici curiae say that, unless the decision of the lower court is reversed, it will `adversely affect vested rights and afford a way to retain mineral servitudes for indefinite periods, and thereby do away with the 10-year prescriptive period applicable to such servitudes.' They conceive and portray situations wherein owners of land desiring to sell and yet reserve minerals for a longer period than ten years would execute promises to sell, withholding ownership in themselves for many years and thereby circumvent the law extinguishing the ownership of minerals servitudes after ten years where there is no exploration by the servitude owner.

"Our answer to the alarms of counsel is that it will be time enough to deal with situations involving fraudulent evasions of our laws and public policy when and if occasion arises. Surely, no one will have the temerity to suggest unlawful scheming on the part of the defendants in the present case." (Emphasis ours.)
It is also interesting to note in the cited case, that an exception of no cause or right of action was filed in the lower court and was overruled and the case was disposed of on its merits.
We feel that the gist of the plaintiff's allegations in the instant case is that the lease with option agreement was primarily designed and executed by the defendant, Ayer Timber Co., as a means of circumventing the public policy of this state. One of the primary elements of such a scheme is the intent of the parties which necessarily must be partially alleged as a conclusion of law. Under these circumstances, we feel the plaintiff should be allowed its day in court in an effort to present any and all facts which would be admissible under the pleadings so that the court would have the benefit of same at the time of rendering an opinion thereon. From the language of Ober v. Williams, supra, we feel that this is the "occasion" when we are called upon "to deal with a situation involving fraudulent evasions of our laws and public policy".
Counsel for the defendants contend that the plaintiff's petition does not specifically allege title to the land was transferred under the lease and option agreement; that if such title did not pass, no servitude could have been retained or created by it because the plaintiff could not have a servitude on its own property. We have previously quoted Paragraph VI of the petition and we feel the underscored portion thereof is sufficient allegation that title to the property passed at the time of the original lease and option agreement rather than the deed, some five years later. In any event, in a case of this magnitude, we feel that any doubt should be resolved against the exceptor in order that the plaintiff may have its day in court.
Even if we were to conclude that the plaintiff had not alleged an actual transfer of title at the time of the original lease and *642 option agreement, we feel that this case should not be disposed of on an exception. As previously stated, the exact factual matter we have before us is res nova, and we are, therefore, fully aware of the far-reaching consequence of any legal pronouncements made on this question. For many years legal scholars have anticipated an effort to take the minerals out of commerce by means of a surface lease. In a Comment entitled "Long Term Leases Affecting Minerals," 8 La.L.Rev. 540 (1947), the author makes the following observations concerning the use of a so-called lease to keep minerals out of commerce:
"From the very beginning of the mineral history of the state, the policy of the law has been steadfastly opposed to the indefinite or perpetual tie-up of mineral interests in all others save the true landowner. Heretofore, the courts have been concerned with curtailing the rights of holders of servitudes and leases in order to prevent perpetual control of these rights and to compel their reversion to the landowner in the absence of reasonably diligent development. Now, however, the problem is presented in reverse, and what was not allowed directly is being undertaken indirectly. The risks encountered by the purported vendors or lessors under such contracts can hardly be exaggerated. (545)
"Thus, it is seen that the courts have been adamant from the very beginning in opposing any circumvention of the clear cut rules governing the duration of mineral rights * * *. In light of this jurisprudential law, it is believed that this new device will not stand juridial scrutiny and is fraught with dangers for the purported lessors. A continuation of such a chain of events as is here noted would not only upset prior mineral jurisprudence but might convert Louisiana for all practical purposes to the ownership theory of mineral rights prevailing elsewhere." (547) (Emphasis added.)
A similar concern for the problem may be found in Vol. XXV, Tulane Law Review, page 180, wherein Eugene A. Nabors points out the dangers of retrospectively reserving minerals prior to the subsequent transfer of the title to the land:
"The recognition of transfers or reservations of reversionary interests, over-sales of minerals, and options to purchase a mineral servitude, if accompanied by the adoption of a rule which makes liberative prescription date from the time of the happening of the contingency which makes the mineral servitude come into existence, would create methods of evading the results which the liberative prescription system generally obtains. The evasive feature of contracts for the future transfer of minerals can be eliminated by the adoption of a rule which makes liberative prescription on both the preliminary contract and the contingent mineral servitude begin to run on the date of execution of the preliminary contract.
"A contract or option for the future sale of land subject to a mineral reservation postpones both the date on which the obligee obtains the land and the accompanying right to acquire the reserved minerals through the regular rules of liberative prescription, but the contract or option keeps the minerals in the landowner for a longer period of time than would be accomplished by an immediate sale of the land subject to a mineral reservation. The establishment of a system of control which would make liberative prescription run on the landowner's minerals prior to the change in his status from landowner to a vendor who reserves the minerals would involve the inconsistency of converting liberative prescription from a rule which favors a landowner to a rule which tends to deprive a landowner of his minerals.
"A study of the Louisiana decisions relating to contractual control over the *643 date of creation of a mineral servitude shows some inconsistency and a feeling of judicial uncertainty in developing this new branch of mineral-servitude law."
While we do not minimize the complications that might arise from a decision herein if it ultimately be rendered in conformity to the plaintiff's theory, we say as was held in Ober v. Williams, supra, "it will be time enough to deal with [such] situations * * * when and if occasion arises". We should not deny plaintiff its day in court merely because of what might happen if the case is decided a certain way.
Having concluded that the exception should be overruled as to the principal defendant, we now pass to the question of whether the same rule should apply to the other defendants as lessees under oil and gas leases which were executed more than ten years from the original lease with option agreement, but less than ten years from the subsequent deed. In addition to the arguments advanced by Ayer Timber Company the defendants lessees contend that they are protected by the laws of registry as provided in LSA-R.S. 9:2721:
"No sale, contract, counterletter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the Office of the Parish Recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties."
And LSA-R.S. 9:2722 which provides:
"Third persons or third parties, so protected by and entitled to rely upon the registry laws of Louisiana now in force and effect and as set forth in this chapter, are hereby redefined to be and to include any third person or third party dealing with an immovable or immovable property or acquiring a real or personal right therein as purchaser, mortgagee, grantee or vendee of servitude or royalty rights, or as lessee in any surface lease or leases or a lessee in any oil, gas or mineral lease and all other third persons or third parties acquiring any real or personal right, privilege or permit relating to or affecting immovable property."
The plaintiff counters the contentions of the lessees by citing the following cases which generally hold that a lessee under an oil and gas lease can acquire no greater right than that of a lessor: Calhoun v. Gulf Refining Co., 1958, 235 La. 494, 104 So.2d 547; Arnold v. Sun Oil Company, 1950, 218 La. 50, 48 So.2d 369; Dixon v. American Liberty Oil Company, 1954, 226 La. 911-922, 77 So.2d 533; Reagan v. Murphy, 1958, 235 La. 529, 105 So.2d 210.
The court in all of the cases cited above by the plaintiff had before them the interpretation of LSA-R.S. 9:1105 and it was held that the legislature had only attempted to classify the rights of the lessee under an oil and gas lease as a real right, but that the provisions of the legislative acts in question did not have the effect of changing the substantive rights of such lessees.
However, as pointed out in the case of Jackson et al. v. Golson, La.App. 2 Cir., 1957, 91 So.2d 394, certiorari denied, the lessees are permitted under LSA-R.S. 9:2721, 9:2722 to rely on the public records and are protected against any instruments which are not filed at the time the lease is executed. While it is true, in the instant case, that the plaintiff has not alleged any knowledge or bad faith on the part of the defendants-lessees, we do not feel the law of registry necessarily affords them any greater right than the lessor. Plaintiff alleges that these lessees should have known from the instruments themselves *644 that the minerals had prescribed at the time the leases in question were executed. In order to pass on this question, it will be necessary to examine the instruments of record in light of other evidence that might be presented. In other words, we feel that these defendants should likewise not be dismissed from the case by means of an exception, but their rights should be adjudicated only after all of the facts have been presented by a trial on the merits. It is obvious that these defendants will not be bound by instruments not of record or of any secret equities between the plaintiff and the principal defendant. It may well be that they will occupy a better position after such a trial than the principal defendant herein, but such conclusions could better be reached after such a trial.
For the reasons stated herein, it is our opinion that the lower court was in error in sustaining the exception of no cause or right of action, and accordingly the case is reversed and the said exception is overruled as to all defendants, and the case is remanded for a trial on the merits consistent with law and the views expressed herein. The costs of this appeal to be paid by appellees and all other costs to await final determination of the cause.
Reversed and remanded.
HARDY, J., dissents and will assign written reasons.
HARDY, Judge (dissenting).
My principal disagreement with the majority opinion rests upon the belief that its conclusions have been based upon unjustified inferences from, rather than actual facts as disclosed by, plaintiff's petition.
It suffices to say that despite the zeal of our courts in the protection of the ten-year prescriptive period of mineral servitude on the ground of public policy, as reflected in the jurisprudence so ably delineated in the majority opinion, I am aware of no established principle which extends this doctrine to the degree effected by the majority opinion in the instant case. It is my opinion that the owner of property possesses the right to lease the same on such terms, conditions and with such provisions as he may determine in and for his own interest. In the absence of compulsion, the acceptance of such qualifications imposed by the lessor requires only the free and willing consent of a prospective lessee. Thus, a lease with such conditions as are provided therein, including an option to purchase, is fundamentally a contractual agreement between the parties thereto. To say that such an agreement, because it may appear to impose excessive burdens upon one party and disproportionate advantages to another, constitutes, in effect, a scheme or conspiracy designed to defeat and evade a principle of public policy, is an unwarranted assumption in the absence of definite and specific factual averments. I do not think this condition has been fulfilled by the allegations of plaintiff's petition.
Conceding the obligation of judicial tribunals in the assiduous protection of principles of public policy, I do not feel that such a consideration justifies the right of judicial interference with private contracts.

On Rehearing.
AYRES, Judge.
A rehearing was granted herein in order that further consideration might be given what we consider the primary and decisive issues or questions presented by the exceptions of no cause and of no right of action urged on behalf of the several defendants. The issues which are, in our opinion, of paramount importance relate to the questions, first, as to whether the leases with option-to-purchase agreements executed by Ayer Timber Company, Inc., the then owner of the realty in fee, created and imposed, upon the lands described therein, mineral servitudes so that, by the nonuse thereof, the tolling of liberative prescription began *645 as of their dates, and, second, whether the other defendants, mineral lessees of Ayer Timber Company, Inc., or their assignees, who contracted on the faith of the public records, are protected by the law of registry.
Prerequisite to a consideration of the aforesaid questions is a resume of the facts allegedly appertaining thereto.
Plaintiff, Chicago Mill and Lumber Company, June 30, 1958, acquired from Harry E. Schadt, Sr., and Mrs. Teresa Murphy Schadt, husband and wife, by authentic act, four certain-described tracts of land in Madison and Tensas Parishes, comprising 4220.06 acres, more or less, for a recited cash consideration of $200,000. All of this property had formerly been acquired by the Schadts from defendant, Ayer Timber Company, Inc., in four separate deeds or transactions, the first of which, dated December 8, 1949, covered 1145.61 acres; the second, dated October 27, 1949, 360 acres; the third, dated August 29, 1950, 2485.65 acres; and the fourth, dated October 3, 1955, 228.80 acres.
The execution of the aforesaid deeds by the Ayer Timber Company, Inc., to Harry E. Schadt and wife was preceded by and in accordance with the provisions of leases with option-to-purchase agreements executed by Ayer Timber Company, Inc., to the Schadts or to other parties whose rights the Schadts had acquired by assignments. These prior instruments were dated, respectively, December 8, 1944, October 27, 1944, August 29, 1945, and October 3, 1944. These leases and options to purchase, except as to their dates, description of the property, names of the lessees, and the consideration, were identical in terms. The agreements recited the lands were demised and leased to the lessees for a period of five years for a stipulated annual rental calculated at $2 per acre. It was stipulated, however,
"* * * that the Lessor retains all oil, gas and other minerals in said land, also reserves the right at all times to enter upon said lands, or any part thereof, and there explore, search and dig and mine for said gas, oil or other minerals and freely carry on the business of exploring for and removing gas, oils or other minerals."
It was further agreed that, at the termination of the leases, the lessor would sell and the lessees might, at their option and election, purchase the properties for a stated consideration calculated to be $20 per acre, payable in cash, or, at the option of the purchaser, in equal annual installments not to exceed five in number, with 6% annual interest on the unpaid balance. In the event of the exercise of the option to purchase, it was stipulated that the lessor would retain and reserve all the oil, gas and other mineral rights, with the right to enter upon said land or any part thereof for the purpose of exploring, searching, digging, and mining for said oil, gas or other minerals, and for removing the same.
In accordance with the aforesaid provisions and reservations as contained in the leases with option-to-purchase agreements, the deeds of conveyance from Ayer Timber Company, Inc., to Mr. and Mrs. Schadt contained the following provision:
"The vendor further reserves to itself and assigns all oil, gas and other mineral rights, which said oil, gas and mineral rights are expressly excluded from this act of sale and are retained and reserved by the vendor and the vendor shall have all the necessary rights of ingress and egress to enter upon said land or any part thereof, and there explore, search, dig and mine for said gas, oil, or other minerals, and freely to carry on the business of exploring for and removing gas, oil or other minerals."
Moreover, it may be pointed out that, in the conveyance from Harry E. Schadt, Sr., and Mrs. Teresa Murphy Schadt to the Chicago Mill and Lumber Company, the sales were made
*646 "Subject To: Reservation of all oil, gas and other minerals under said above described property contained in said deed hereinabove referred to * * *."
that is, in the deed from Ayer Timber Company, Inc., to Mr. and Mrs. Schadt.
As a basis for its demand for a cancellation of the aforesaid mineral reservations, plaintiff alleges that no use was made of said servitudes, such as by the drilling of a well in search of oil, gas or other minerals, on any of said lands within a period of ten years from the dates of the execution of the aforesaid leases with option-to-purchase agreements, from which dates it is contended prescription started to run.
However, it is alleged that under date of November 1, 1956, the defendant, Ayer Timber Company, Inc., executed an oil, gas and mineral lease to Francis W. Scott covering a portion of the property acquired by plaintiff, as aforesaid, and that, under date of February 13, 1958, an oil, gas and mineral lease was executed by Ayer Timber Company, Inc., to Shell Oil Company covering another portion of said property; that said mineral lessees or their assigns had drilled oil or gas wells upon said property, but that said operations were begun and completed prior to the expiration of the 10-year period following the execution of the deed from Ayer Timber Company, Inc., to Mr. and Mrs. Schadt.
It may be appropriate to point out that all the instruments to which we have referred are attached to and made a part of plaintiff's pleadings, without restriction or limitation whatsoever. Hence, the recitals of those instruments constitute a part of the pleadings and may be taken into account in giving consideration to the question as to whether plaintiff's petition discloses a cause of action.
Plaintiff's position is that, by the use of the leases with option-to-purchase agreements, the defendant, Ayer Timber Company, Inc., sought to circumvent the law relative to the 10-year period of liberative prescription applying to mineral servitudes for nonusage, as provided by LSA-C.C. Art. 789, and to evade the public policy of the State relative to the establishment or perpetuation of mineral servitudes without the exercise of the use thereof for a period of time exceeding 10 years.
The position of the defendants is that no mineral servitude was created or brought into existence until the execution of the deeds in 1949, 1950, and 1955, wherein the vendor, Ayer Timber Company, Inc., sold the land and reserved the minerals; that the 10-year liberative prescription could not, and did not, begin to run against said reservations and, therefore, the exercise of the use of the said servitudes by the drilling of said wells was well within the 10-year period following the creation of said servitudes.
The mineral lessees and their assigns further rely upon the position that they are protected in their rights by the law of registry inasmuch as they are not charged with knowledge of or bound by any statement of facts not contained in or disclosed by the public records.
Thus, it is a matter of paramount concern whether the mineral servitudes were created and imposed by virtue of the original leases with option-to-purchase agreements or by the deeds executed pursuant to such prior instruments.
Servitudes may be established by all acts by which property can be transferred (LSA-C.C. Art. 743), such as by the alienation of immovable property, subject to a real condition, or by alienating to one person the immovable property and, to another, some real right to be exercised upon it, such as a sale with the reservation of the minerals (LSA-C.C. Art. 2012), as one cannot be both the owner of property and the holder of a servitude thereon. In the latter instance, the right of servitude would be extinguished by confusion. LSA-C.C. Arts. 783, 805. For instance, it has been held that when the owner of land became *647 the owner of a mineral servitude thereon, the title to the servitude became merged with the title to the land and was, thus, extinguished by confusion. Arent v. Hunter, 171 La. 1059, 133 So. 157.
Whether the leases with option-to-purchase agreements created or imposed servitudes upon the property, such must be determined from the nature, purport, and effect of such instruments as disclosed by the language therein employed, as there are no allegations of fraud, error, or mistake in the confection of the agreements. Nor is this an action to reform the instruments, nor could it be, because all the parties to the instruments are not made parties to this action. Chronos Land Co. v. Crichton, 150 La. 963, 91 So. 408; Bonvillain v. Bodenheimer, 117 La. 793, 42 So. 273; Reitzell v. Louisiana Central Lumber Co., 2d Cir., 1929, 12 La.App. 464, 125 So. 307; 76 C.J.S. Reformation of Instruments §70, pp. 422, 423.
Moreover, plaintiff is an assignee of the Schadts. Though the leases with option-to-purchase agreements are private acts, the signatures have been acknowledged by the parties. The deeds are authentic acts. Pertinent here are the following codal provisions:
"Art. 2236. The authentic act is full proof of the agreement contained in it, against the contracting parties and their heirs or assigns, unless it be declared and proved a forgery."
"Art. 2242. An act under private signature, acknowledged by the party against whom it is adduced, or legally held to be acknowledged, has, between those who have subscribed it, and their heirs and assigns, the same credit as an authentic act."
"Art. 2276. Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since."
The principle is likewise well established that if there be any conflict between the documents attached to a petition and the allegations, the contents of the documents prevail in the absence of allegations of fraud or mistake sufficient to warrant reformation or a prayer for reformation. Jennings v. Prejean, 216 La. 645, 651, 44 So.2d 325; In re Nunez, 203 La. 847, 14 So.2d 680.
A fundamental rule of law of this State is that perfect ownership carries with it the right to use, to enjoy, and to dispose of one's property in the most unlimited manner unless specifically restricted or prohibited. LSA-C.C. Art. 491. While there is no mineral estate in oil and gas, as such, the grant or the retention of a right to go on the land for the exploration of such minerals constitutes a servitude. Long-Bell Petroleum Co. v. Tritico, 216 La. 426, 43 So.2d 782, 791; Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207.
No law has been cited, and we know of none, which forbids the owner of land to sever its constituent parts, sell one or more of those parts and retain the other, or others. Thus, an owner of land may sell the land and reserve to himself the minerals (De Moss v. Sample, 143 La. 243, 78 So. 482), or sell the minerals and retain the land.
Where a landowner sells only the mineral rights in his land or sells the land and reserves the mineral rights, the sale constitutes a dismemberment of the ownership and is a sale or reservation, as the case may be, of one of the elements of ownership. Palmer Corporation of Louisiana v. Moore, 171 La. 774, 132 So. 229, 232.
The right, however, to impose such rights or servitudes on an estate belongs exclusively to the owner and may only be established by acts such as are used in the transfer of title to immovable property. LSA-C.C. Arts. 743, 766, and 770; Long-Bell *648 Petroleum Co. v. Tritico, supra, and the authorities therein cited.
And, it may be emphasized there is no public policy against the right of an individual to make prospective agreements as to the sale of his property. Moreover, such right is specifically conferred or recognized by LSA-C.C. Art. 2462. This right received early recognition in the decisions of the courts of this State. For instance, in Peck v. Bemiss, 10 La.Ann. 160, 162-163, Chief Justice Slidell stated:
"This reciprocal promise of sale did not make Peck the owner of the land. It gave him only the right of becoming so at a future time. It created in his favor an obligation binding upon Overton, and by which, if he refused voluntarily to comply, he could be judicially constrained to a specific performance or subjected, if he had put it out of his own power to comply, to an action for damages. Until a voluntary or forced execution of the promise, the ownership did not pass to Peck.
"It is true that the 2437th (2462) Article of our Code declares, that a promise to sell amounts to a sale, when there exists a reciprocal consent of both parties, as to the thing and the price thereof, or as it is said in the French text, La promesse de vendre vaut vente, lorsqu'il y a consentement reciproque des deux parties sur la chose et sue le prix. But that we are not to take these emphatic expressions au pled de la lettre, and recognize no difference between a sale and a promise to sell, is obvious from other provisions of our Code, from the history of the corresponding article of the Napoleon Code from which our own is taken, and from a just appreciation of the nature of things and the suggestions of common sense, applied to the practical dealings of men with each other. The law would be censurable for a strange violation of the principles of reason and justice, and for a shortsighted view of expediency, if it deprived individuals of the right of making prospective agreements for a sale, or told them that if they make each other a reciprocal promise to buy and sell a thing a year hence, for example, that they should be absolutely considered as having made a present sale, with all the incidents of a shifting of the risk, revenues, accretion, &c., which pertain to a contract of sale." (Emphasis supplied.)
In Ober v. Williams, 213 La. 568, 35 So 2d 219, 220, it was stated:
"The theory of plaintiff's case is that the mineral reservation of the Williamses, contained in their deed to White, was extinguished by prescription of ten year non-user after November 12, 1944 (rather than after December 12, 1945, ten years subsequent to the act of sale), because, in view of White's performance of the condition contained in the agreement of November 12, 1934, the legal title to the land vested in him retrospectively as of the date of that agreement.
* * * * * *
"The initial point for discussion is whether the performance by White of the conditions contained in the agreement of November 12th 1934 had the retrospective effect of vesting ownership of the property in White as of the date of that agreement. Counsel for plaintiff insist that such a retroactive transfer of ownership occurred by reason of the provisions of Article 2041 of the Civil Code which declares that, when the condition of a contract is complied with, it has a retrospective effect to the date that the engagement was contracted. Counsel are joined in their argument by amici curiae, who go even a step farther by asserting that the contract of November 12th 1934 constituted a sale in praesenti.
"We do not view the contentions as meritorious. The agreement of November *649 12, 1934, is nothing more or less than a promise to sell and purchase which did not effect a retrospective transfer of ownership to White by his performance of its conditions. On the contrary, fulfillment of the conditions of the contract vested only in each party a right to enforcement by specific performance under Article 2462 of the Civil Code.
"The proposition advanced by plaintiff has been many times made and we find consistent rejection of it in a long line of authorities. In most of the adjudications, the party stressing the contention (that a promise to sell is a sale) placed much reliance on Article 2462 of the Civil Code which provides that `A promise to sell, when there exists a reciprocal consent of both parties as to the thing, the price and terms, and which, if it relates to immovables, is in writing, so far amounts to a sale, as to give either party the right to enforce specific performance of same.' But, in every case where the court has been faced with the question of determining ownership of the thing prior to the passage of title, it has consistently stated that the promise did not effect a transfer of ownership to the promisee. * * *." (Emphasis supplied.)
After quoting from Peck v. Bemiss, supra, as we have done, and from Trichel v. Home Ins. Co., 155 La. 459, 99 So. 403, 404, as follows:
"* * * our conclusion is that any agreement for the sale of real estate, which is not intended to be the final writing between the parties, but, on the contrary, to be followed by another and final deed, is a mere promise of sale and not a sale, and does not transfer the title to said property; unless it clearly appear that the parties contemplated that the new deed should be only a confirmation of the first, and not indispensable for the transfer of title. * * *."
the court further stated, in Ober v. Williams, supra:
"The agreement of November 12, 1934, falls squarely within the above cited jurisprudence. It is simply a promise to sell, not absolute, but wholly conditional upon White's performance of certain acts for it to become binding and enforceable. Yet, counsel for plaintiff grasp at the performance of the conditions by White as a ground for attaching greater legal import to the promise of the Williamses and thus convert their conditional promise to sell into a transfer of ownership when, in truth, White's performance merely changed the promise of the Williamses from conditional to absolute. To illustrateif the Williamses had bound themselves absolutely to transfer the land a year hence, ownership would not have vested in White until the execution of the deed. Obviously, then, the Williamses did not confer ownership on White at an earlier date where their promise was conditional and only became absolute when White did certain things.

"Article 2041 of the Civil Code, relied upon by counsel, did not have the magic effect of vesting ownership in White retrospectively. That article, which is found in that part of the Code dealing with conditional contracts, declares that, when the condition has been complied with, it has a retrospective effect to the day the engagement was contracted. This merely means that the rights of the obligor, upon compliance, revert to the date of the contract but it offers no foundation for an argument that, in cases involving contracts to sell and purchase immovable property conditioned upon the happening of an event or the doing of certain things, the ownership is transferred retrospectively by the performance of the condition. On the contrary, compliance with the condition only renders the contract executory; makes the *650 reciprocal promises absolute and establishes the rights and liabilities of the parties as of the date of the agreement." (Emphasis supplied.)
It was pointed out in the Trichel case, supra, that, on the face of the agreement therein entered into, the agreement was not to be final but was to be followed by a formal deed under certain specified conditions. Such is the situation here and such was the situation in Ober v. Williams, supra. There, it was held that the prescription of 10 years nonuser did not commence to run against the mineral servitude reserved by the vendors in the conveyance of the land until the deed was executed creating the servitude. In that case, the vendee had the right to demand a transfer of the ownership of the property to him on or before November 12, 1935. Notwithstanding this fact, the deed admittedly was not executed until December 12, 1935, and it was held that the servitude was created on that date, and that prescription could not commence to run until the servitude came into existence.
The leases with option-to-purchase agreements are of a twofold character as indicated by their title. As to the first of these, it may be pointed out that the parties to the agreement are denominated lessor and lessee, respectively. The granting clause reads as follows:
"That in consideration of the rent and covenants herein contained on the part of the Lessee and his heirs, executors, administrators and assigns, to be paid, performed and observed, the Lessor, its successors and assigns, does hereby demise and lease unto the said Lessee * * *." (Emphasis supplied.)
The agreements fixed definite terms of five years from their dates. The rent was payable in annual installments during the terms of the respective leases. The lessees were obligated to protect the lands leased from fires and were prohibited from assigning the leases or subletting the premises without the permission of the lessor. The lessee was not required to pay taxes or assessments during the terms of the leases, nor to assume any other burdens or risks of ownership. By these agreements, there was no pretension of a transfer or conveyance of title to the property or the creation of a mineral servitude on the property. The instruments contain no language suggestive of translation of title.
Plaintiff suggests the clauses in the leases concerning the retention of the oil, gas and other minerals and the right to enter upon the land or any part thereof for the purpose of exploring, producing, and removing such minerals as indicative of an intention other than to lease. When this provision is read in connection with the other provisions of the lease, we can reach no conclusion other than that it was an incidental provision included solely to make it clear that the lease did not include the right to explore for minerals and did not preclude the lessor from such activities, particularly in view of the fact that the agreement contained no words indicating a translation of the property.
In the sale of real estate, the transfer of ownership is incomplete without a deed translative of title. Scott v. Apgar, 238 La. 29, 113 So.2d 457; Ober v. Williams, supra; Kendall v. Kendall, 174 La. 148, 140 So. 6; Davis v. McCain, 171 La. 1011, 132 So. 758; Campbell v. Richmond Ins. Co., 156 La. 455, 100 So. 679; Trichel v. Home Ins. Co., supra.
Ownership of the property in the instant case, therefore, only passed from Ayer Timber Company, Inc., to Harry E. Schadt and Mrs. Teresa Murphy Schadt on the execution of the deeds conveying title thereto. Hence, the mineral servitudes did not come into existence until those dates and it was only from those dates that the 10-year liberative prescription began to run.
Moreover, it may be pointed out that, in brief and in oral argument before this court, counsel for plaintiff stated:

*651 "Plaintiff here does not base its case on the theory that title passed as of the respective dates of the `Lease With Option To Purchase' contracts as the plaintiff in the Williams case (Ober v. Williams, supra) attempted with the contracts to sell. Unlike the Williams case, plaintiff here has alleged and will show that the so-called `leases' were used only for the purpose of attempting to do indirectly what it could not do directly, contrary to the well-known and well-established public policy law of Louisiana." (Parenthesis supplied.)
The answer to the contention that the contracts herein involved are fraudem legis is that there can be no attempt to evade, prolong or extend the 10-year prescription of nonuse until the mineral servitude is created. Until that is done, no question as to the violation of public policy can, in fact, arise. Nor is there any public policy, so far as we know or have been informed, against the making of prospective agreements for the sale of lands and for the eventual reservation of the minerals from such sales, if and whenever such sales are made.
The public policy, as relates to the prescription of nonuser as applied to mineral servitudes, is directed against attempts to renounce prescription in advance, or to suspend or to interrupt prescription by means other than user or other means expressly recognized by law, such as acknowledgments made specifically for the purpose and with the intention of interrupting the running of prescription. What the courts have considered as contrary to public policy are agreements which seek to cause the lands to be burdened with mineral servitudes for more than 10 years without user. Reagan v. Murphy, 235 La. 529, 105 So.2d 210; Hicks v. Clark, 225 La. 133, 72 So.2d 322; Ober v. Williams, supra.
We therefore conclude that plaintiff's plea of 10 years' liberative prescription is inapplicable to the facts of this case in that the required 10-year period did not transpire following the creation of the mineral servitudes prior to the use thereof by the mineral lessees of the defendant, Ayer Timber Company, Inc., and their assigns.
Moreover, as to the mineral lessees of Ayer Timber Company, Inc., and their assigns, the record makes it abundantly clear, and it is not contended, they were in any way implicated in any scheme or device to circumvent the public policy of this State relative to the 10-year liberative prescription applicable to mineral servitudes. Hence, they have invoked, for the further protection of their rights, the law of registry. Appropriate to this contention is LSA-R.S. 9:1105, which provides that owners of oil, gas and other mineral leases and contracts shall have the benefit of all laws relating to owners of real rights in immovable property.
The statutory law pertaining to the registry of instruments affecting immovable property is, however, found in LSA-R.S. 9:2721-2722, which read as follows:
§2721.
"No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties. Acts 1950, 2nd Ex.Sess., No. 7, §1."
§2722.

"Third persons or third parties so protected by and entitled to rely upon the registry laws of Louisiana now in force and effect and as set forth in this Chapter are hereby redefined to be and to include any third person or third party dealing with any such immovable or immovable property or acquiring a *652 real or personal right therein as purchaser, mortgagee, grantee or vendee of servitude or royalty rights, or as lessee in any surface lease or leases or as lessee in any oil, gas or mineral lease and all other third persons or parties acquiring any real or personal right, privilege or permit relating to or affecting immovable property. Acts 1950, 2nd Ex.Sess., No. 7, §2." (Emphasis supplied.)
Lessees under oil, gas and mineral leases are particularly brought within the protection of the statute as relates to registry, as shown by the emphasized portions of the last of the aforesaid sections. We so held in Jackson v. Golson, La.App. 2d Cir., 1956, 91 So.2d 394, in which writs were denied by the Supreme Court.
We are not unmindful of the ruling to the contrary by the Supreme Court in Arnold v. Sun Oil Co., 218 La. 50, 48 So.2d 369. That decision, however, was prior to the amendment of Act 205 of 1938 by Act 6 of the 2nd Extra Session of 1950, which is now LSA-R.S. 9:1105, and which reads as follows:
"Oil, gas and other mineral leases, and contracts applying to and affecting these leases or the right to reduce oil, gas, or other minerals to possession, together with the rights, privileges, and obligations resulting therefrom, are classified as real rights and incorporeal immovable property. They may be asserted, protected, and defended in the same manner as may be the ownership or possession of other immovable property by the holder of these rights, without the concurrence, joinder, or consent of the landowner, and without impairment of rights of warranty, in any action or by any procedure available to the owner of immovable property or land. This Section shall be considered as substantive as well as procedural so that the owners of oil, gas and other mineral leases and contracts within the purpose of this Section shall have the benefit of all laws relating to the owners of real rights in immovable property or real estate. As amended Acts 1950, 2nd Ex.Sess., No. 6, §1."
However, the Supreme Court, in Reagan v. Murphy, 235 La. 529, 105 So.2d 210, in discussing the Arnold v. Sun Oil Co. case, held that, by the amendment, the Legislature did not intend to change the essence of the contractual rights and obligations between mineral lessees and lessors, but only that it sought to place mineral lessees on the same level as landowners by conferring on them benefits of the laws relating to owners of immovable property, so that the owners of mineral leases should have the benefit of all laws relating to the owners of real rights. The question therein concerned as to whether or not the lessee acquired a real right in the leased premises has no application here inasmuch as lessees, eo nomine, are now granted the benefits and protection of the registry laws. The amendment succeeded the pronouncement to the contrary in the Arnold v. Sun Oil Co. case.
For the aforesaid reasons, we are constrained to conclude that we were in error in our original opinion and decree in overruling the exceptions of no cause and of no right of action. We now conclude that the judgment of the lower court, in sustaining these exceptions, was correct.
Accordingly, the judgment appealed is affirmed at plaintiff-appellant's cost.
Affirmed.
BOLIN, Judge, dissents, adhering to his views as heretofore expressed in the original opinion.