852 So.2d 1174 (2003)
COHORT ENERGY COMPANY, Plaintiff-in-Concursus-Appellee,
v.
CADDO-BOSSIER PARISHES PORT COMMISSION, The Cowley Corporation, Kathryn Nichols Cowley, Sheri Lynn Cowley Soulie, Susan A. Cowley Bantle, The Kathryn C. Turner Testamentary Trust, The Dorothy Colleen Cowley Trust and Dorothy Colleen Cowley, Defendant-Appellant; Defendants-Appellees.
No. 37,449-CA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 2003.
*1175 Tutt, Stroud & Bordelon, LLC, by Charles G. Tutt, Jennifer P. McKay, Shreveport, for Appellant, Caddo-Bossier Parishes Port Commission.
Blanchard, Walker, O'Quin, & Roberts, by William Timothy Allen III, Paul M. Adkins, Shreveport, for Appellees, The Cowley Corporation, Argent Financial Group, Inc. and E.H. Turner, III, as Co-Trustees of The Kathryn C. Turner Testamentary Trust, Kathryn Nichols Cowley, Sheri Lynn Cowley Soulie, Susan A. Cowley Bantle, The Kathryn C. Turner Testamentary Trust, The Dorothy Colleen Cowley Trust and Dorothy Colleen Cowley LeBlanc.
Hargrove, Pesnell & Wyatt, by Paul A. Strickland, Shreveport, for Plaintiff-in-Concursus-Appellee, Cohort Energy Company.
Before STEWART, MOORE and TRAYLOR (Pro Tempore), JJ.
TRAYLOR, Judge Pro Tempore.
This appeal requires us to interpret Article IX, Section 4 of the Louisiana Constitution of 1974 ("1974 Constitution") and La. R.S. 31:149, two provisions in our law dealing with imprescriptible mineral interests. The Caddo-Bossier Parishes Port Commission ("Port Commission") appeals a summary judgment granted in favor of a group of private purchasers, defendants, known as ("the Cowleys"[1]), holding that *1176 the mineral servitude created by the Port Commission when it sold a 340-acre tract to the Red River Waterway District ("Waterway District") on April 6, 1987, prescribed after ten years' nonuse on April 6, 1997. Consequently, when the Waterway District sold the subject property to the Cowleys six months later on September 5, 1997, no mineral servitude burdened the tract in question, and the Cowleys acquired the land and the minerals in and under the tract. For the following reasons, we reverse and render.

FACTS
On April 6, 1987, the Port Commission conveyed a 340-acre tract of land to the Red River Waterway District ("Waterway District") reserving the minerals "in perpetuity, in accordance with La. R.S. 31:149."[2] Ten years and six months later, on September 5, 1997, the Waterway District conveyed the property without reservation of the minerals to the Cowleys.
On April 2, 1998, the Cowleys executed a mineral lease ("Cowley Lease") covering the tract in favor of Cohort Energy Company ("Cohort"). The Cowley Lease was granted for a primary term of three years and provides for a one-fifth mineral royalty interest.
On November 18, 1999, the Port Commission executed a mineral lease ("Port Lease") in favor of Cohort covering the tract owned by the Cowleys. The Port Lease was granted for a primary term of two years and provides for a one-fifth mineral royalty interest.
Several unit wells were drilled on parts of the subject property resulting in gas production. When production commenced and revenues accrued, Cohort, on October 12, 2001, initiated this concursus proceeding by petition and placed $66,282.64 in the registry of the court; this sum represented one fifth of all production thus far attributable to the subject property. Cohort named the Port Commission and the Cowleys as defendants in order to determine ownership of the proceeds.
The petition recited the fact that both the Cowleys and the Port Commission executed mineral leases to Cohort covering the property. Cohort's petition further alleged that it was unable to determine to whom the proceeds were owed:
(1) If the Port is the `state' under Article 9, Section 4(B),[3] of the Louisiana Constitution of 1974, the mineral servitude created by the mineral reservation of the Port on April 6, 1987, is imprescriptible, and the Port is the current owner of the minerals underlying the Subject Property;

*1177 (2) If the Port is not the `state' under the Louisiana Constitution of 1974, but the Port is a `person' under the Louisiana Revised Statute 31:149 A, then the ten-year nonuse prescriptive period running against the Port's mineral servitude may have been suspended during the time the Red River Waterway District owned the Subject Property;
(3) If the Port is neither the `state' under Article 9 Section 4(B), of the Louisiana Constitution of 1974 nor a `person' under Louisiana Revised Statute 31:149, the Port's mineral servitude created on April 6, 1987, would have prescribed on April 6, 1997, and the Cowleys would be the current owners of the minerals in and under the Subject Property.
The Port Commission filed a motion for summary judgment alleging that it, and not the Cowleys, is the current owner of the minerals. The Port Commission argued that it had reserved the rights in the minerals on the property and that it was the "state" under La. Const. art. IX, § 4(B) (1974) which provides that state-owned mineral interests cannot be lost by prescription. The Port Commission also argued that it was a "person" for purposes of La. R.S. 31:149, which suspends the running of prescription against persons who have sold land to the state, its political subdivisions, agencies or any legal entity with expropriation authority. Accordingly, the Port Commission claimed that the ten-year prescriptive period did not run against its mineral servitude while the property was in the hands of the Waterway District, and it remains the owner of the minerals in and under the subject property.
The Cowleys opposed the motion arguing that the Port Commission is neither the "state" nor a "person" for purposes of the question presented. The trial court denied the Port Commission's motion for summary judgment and issued an Assignment of Reasons for Judgment ("Reasons for Judgment") concluding that the Port Commission was not the "state" under La. Const. art. IX, § 4(B) (1974), and it was not a "person" under La. R.S. 31:149. A final judgment was not signed or filed in the record.
Subsequently, the Cowleys moved for summary judgment, which the trial court granted for the reasons stated in the Reasons for Judgment. A final judgment was signed, and this appeal followed.

DISCUSSION
Appellate courts review summary judgments de novo under the same criteria that govern the district courts' consideration of whether summary judgment is appropriate. Clark v. City of Shreveport, 31,407 (La.App.2d Cir.01/20/99), 726 So.2d 1042, writ denied, 99-0502 (La.04/01/99), 742 So.2d 872. A motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there exists no genuine issue as to any material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966.
Interpretation of a statute is a question of law that may be decided by summary judgment. In reviewing questions of law, the appellate court gives no special weight to the findings of the trial court, but exercises its constitutional duty to review questions of law and renders judgment on the record. Gardner v. State ex rel. Dept. of Educ., XXXX-XXXX (La.App. 1st Cir.03/28/03), 844 So.2d 311, writ denied, XXXX-XXXX (La.06/27/03), 847 So.2d 1280.
The question presented in this case by motion for summary judgment is whether the mineral servitude created on April 6, 1987 by the Port Commission prescribed ten years later on April 6, 1997 for nonuse.
*1178 The Port Commission claims that its mineral servitude is imprescriptible because it is both the "state" under La. Const. art. IX, § 4(B) (1974) and because it is a "person" under La. R.S. 31:149.
A reservation of minerals is extinguished by prescription of nonuse if not exercised within ten years, and a mineral servitude owner then loses his rights unless some event or condition intervened during that time to interrupt the running of prescription. Horton v. Mobley, 578 So.2d 977 (La.App. 2d Cir.1991), writ denied, 582 So.2d 1310 (La.1991); Haynes v. King, 219 La. 160, 52 So.2d 531 (1951); Standard Oil Co. of Louisiana v. Futral, 204 La. 215, 15 So.2d 65 (1943); Palmer Corp. of Louisiana v. Moore, 171 La. 774, 132 So. 229 (1930); Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207, 239 (1920); see La. R.S. 31:27. The ten-year prescriptive period begins to run from the date the mineral rights are acquired or created. Ober v. Williams, 213 La. 568, 35 So.2d 219 1948); Chicago Mill & Lumber Co. v. Ayer Timber Co., 131 So.2d 635 (La.App. 2d Cir.1961); see La. R.S. 31:28.
The law of Louisiana regarding prescription of mineral interests reflects a historically strong policy against separate ownership of minerals and a policy of keeping land and minerals in commerce. Ultramar Oil & Gas Ltd. v. Fournet, 598 So.2d 645 (La.App. 3d Cir.1992), writ denied, 605 So.2d 1122 (La.1992); Kalmn, Inc. v. Walker Louisiana Properties, 488 So.2d 340 (La.App. 3d Cir.1986).[4]
*1179 In this instance, all the parties agree that ownership of the mineral interests at stake in this case turns upon whether the Port Commission's mineral servitude prescribed for nonuse, and that question turns upon whether the Port Commission is either the "state" under La. Const. art. IX, § 4 (1974) or a "person" under La. R.S. 31:149.
Is the Port Commission the "State" Under La. Const. art. IX, § 4 (1974)?
Louisiana Const. art. IX, § 4 (1974) provides, in pertinent part:
(A) Reservation of Mineral Rights. The mineral rights on property sold by the state shall be reserved, ...
(B) Prescription. Lands and mineral interests of the state, of a school board, or of a levee district shall not be lost by prescription....
....
(Emphasis added).
Our interpretation is guided by the following established principles of constitutional construction expressed by the supreme court in Succession of Lauga, 624 So.2d 1156 (La.1993):
In general, the constitution is subject to the same rules of interpretation as other laws and written instruments. When a constitutional provision is clear and unambiguous, and its application does not lead to absurd consequences, it must be applied as written without further interpretation in search of its intent. Every provision must be interpreted in light of the purpose of the provision and the interests it furthers and resolves. When a constitutional provision is identical or very similar to that of a former constitution, it is presumed that the same interpretation will be given to it as was attributed to the former provision. Because the question is how the constitution was understood by the people adopting it, not merely how it was viewed by the drafters, the debates of a convention, as a general rule, cannot be resorted to for the purpose of varying the otherwise clear and unambiguous meaning of a constitutional provision. (Citations omitted) (Emphasis added).
....
It is a fundamental principle of constitutional construction that when a provision is clear and unambiguous it should be applied as written. Id. (Citations omitted). Accordingly, effect should be given to the purpose indicated by a fair interpretation of the language used, and that construction which effectuates, rather than that which destroys a plain intent or purpose of a constitutional provision, is not only favored but will be adopted. Board of Comm'rs v. Department of Natural Resources, 496 So.2d 281 (La.1986); Barnett v. Develle, 289 So.2d 129 (La.1974); Stokes v. Harrison, 238 La. 343, 115 So.2d 373 (1959); In re Bankston, 306 So.2d 863 (La.App. 1st Cir.1974).
....
... [E]very clause in a written constitution is presumed to have been inserted for some useful purpose, and courts should avoid a construction which would render any portion of the constitution meaningless. Barnett v. Develle, 289 So.2d 129 (La.1974); Meyers v. Flournoy, 209 La. 812, 25 So.2d 601 (1946). Furthermore, our customary rules of constitutional and statutory interpretation require that different provisions relating to the same subject matter must be interpreted in the light of each other. *1180 Hoppe v. City of Shreveport, 340 So.2d 1314 (La.1976); Antoine v. Consolidated-Vultee Aircraft Corp., 217 La. 251, 46 So.2d 260 (1950); La. C.C. art. 13.
Prior to the adoption of the 1974 Constitution, the Louisiana Constitution of 1921 ("1921 Constitution") contained a provision nearly identical to Section 4(A) above in prior La. Const. art. IV, § 2 (1921), which stated in pertinent part:
In all cases the mineral rights of any and all property sold by the State shall be reserved....
This provision changed the prior law, which had provided no such prohibition against alienation of state minerals. Dynamic Exploration, Inc. v. LeBlanc, 362 So.2d 734, n. 1 (La.1978). Although there was no written provision in the 1921 Constitution similar to La. Const. art. IX, § 4(B) (1974) regarding the imprescriptibility of state-owned minerals, a jurisprudential rule holding that prescription does not run against state-owned mineral rights was established as a corollary to the prohibition against alienation of state-owned minerals. See Shell Oil Company v. Board of Commissioners of Pontchartrain Levee District, 336 So.2d 248 (La.App. 1st Cir.1976), writ refused, 338 So.2d 1156 (La. 1976). (The court held that the "Constitutional prohibition against the alienation of minerals by the state equally prohibits the acquisition of these minerals by others by the running of prescription against the state.") Id. at 254; see also, Dynamic Exploration, supra; see also, Guy E. Wall, "Imprescriptible Mineral Interests in Louisiana," 42 La. L.Rev. 123, 137 (1981). Thus, in this regard, La. Const. art. IX, § 4(B) (1974) codified existing jurisprudence. 42 La. L.Rev. at 138.
Like the case presently before this Court, the wording of former La. Const. art. IV, § 2 (1921) raised the question of whether the prohibition against alienation by the "state" also applied to state agencies.
In Stokes v. Harrison, 238 La. 343, 115 So.2d 373 (1959), the supreme court unanimously held that when the Beauregard Parish School Board sold a parcel of land that it had previously purchased from a private landowner without reservation of minerals, the sale was not a sale of property by the "state" for purposes of La. Const. art. IV, § 2 (1921). Id. at 381.[5]
The Stokes court concluded that the framers of the constitution intended that the mandatory reservation of minerals in sales of lands applied only where the sale was by the "state" proper, holding that the constitutional requirement that minerals be reserved was inapplicable to lands sold by "political corporations." Two years later, Judge Tate of the Third Circuit opined that what the supreme court meant to say in Stokes was that the term "state" does not refer to a purely local political subdivision such as a school board, but does encompass an arm of the executive branch such as a levee district. See Rycade Oil Corporation v. Board of Commissioners, 129 So.2d 302 (La.App. 3d Cir.1961) (Tate, J. concurring).
The First Circuit considered the "state" issue again in Shell Oil Company, supra. Distinguishing Stokes, the court held that the Pontchartrain Levee District, which had acquired the land in question by grant from the state and "... was created as an arm of the executive branch of *1181 government for the purpose of carrying out a governmental function, i.e., flood control, is the `state' within the intent of Section 2, Article IV of the Constitution of 1921." Id. at 253. The appellate court stated that the opinion accorded with the supreme court's holding in Stokes, which had, in fact, affirmed the First Circuit's judgment and, as noted by the First Circuit panel, the Stokes decision "adopted with approval that portion of our opinion in the same case wherein we made a distinction between the `state' as a separate legal entity on the one hand and its political subdivisions on the other." Id. The supreme court denied writs.
Although the supreme court denied writs in Shell Oil Company, supra, it granted a writ application in a subsequent First Circuit case involving the same issue with the Pontchartrain Levee District in a concursus suit over disputed ownership of mineral rights. In Dynamic Exploration, Inc., supra, the question was whether the levee district was the "state" under La. Const. art. IV, § 2 (1921). The supreme court affirmed the First Circuit's holding that the levee district was the "state" under La. Const. art. IV, § 2 (1921), "for reasons similar to those set forth in Shell Oil Company v. Board of Commissioners of Pontchartrain Levee District," supra. It further stated:
Decisions of this court, have consistently held that, for purposes of this article, levee districts were a state agency, performing a state function and administering state lands; they were therefore subject to this constitutional provision prohibiting alienation after 1921 of mineral rights owned by the state. (Footnote text with citations omitted) (Emphasis added).
Hence, the supreme court expressly approved the rationale used to decide Shell Oil Company, supra, and Dynamic Exploration, Inc., supra, and tacitly approved the First Circuit's analysis in Stokes, supra. Even though these cases interpreting the meaning of the term "state" were decided under the 1921 Constitution, since the former constitutional provision and La. Const. art. IX, § 4(A) (1974) are nearly identical, and since the prior jurisprudence regarding prescription of state lands and minerals is codified in La. Const. art. IX, § 4(B) (1974), the same rationale governing the decisions in these cases should apply to the case sub judice. "When a constitutional provision is identical or very similar to that of a former constitution, it is presumed that the same interpretation will be given to it as was attributed to the former provision." Succession of Lauga, supra.
The conclusions reached in the cases decided under the 1921 Constitution holding that a levee district was the "state" for purposes of non-alienability of state minerals were based on the rationale that levee districts were "state agencies" created by the state to carry out the duties of the state to construct and maintain levees. Ownership of the land had not really changed hands. The state had simply transferred the land to the levee districts for administration. See Shell Oil Company, supra; State ex rel. Board of Com'rs v. Grace, 161 La. 1039, 109 So. 830 (1926). In some instances, it is noted as an important factor that the members of the levee district were appointed by the governor and, therefore, levee districts were "arms of the executive branch." See, e.g., Shell Oil Company, supra at 253; King v. Board of Com'rs for Atchafalaya Basin Levee, 148 So.2d 138, 145 (La.App. 3d Cir.1963)(Tate, J. concurring), writ denied, 244 La. 118, 150 So.2d 585 (1963).
On the other hand, in Stokes, supra at 377-8, the court stated that legislative enactments *1182 and the jurisprudence conclusively show that a school board is "an agency of the State, a corporate body, a political corporation, the recipient from the legislature of certain delegated powers" ... "[n]owhere, however, do we find a parish school board called the `State.'" In affirming the court of appeal, the supreme court expressly agreed with the following statement from the First Circuit:
A comparison of the language of Sections 2, 12 and 13 of Article 4 of the Constitution in this particular [case] leaves it crystal clear that where the framers intended that the restriction or limitation should apply to the State only as a separate entity from its political subdivision, the word State alone was used, but where the limitation or restriction was intended to apply to the State and to all political subdivisions thereof, the intent was so spelled out in terms of `the State, or any political corporation thereof.'
Id. at 379.
Hence, the Stokes court concluded that a "political subdivision" or a "political corporation" was not intended by the framers of the Constitution to be included within the term "state" where it applies to the restriction or limitation of the strong policy of this state favoring prescription of reserved mineral interests.
With respect to prescription, La. Const. art. IX, § 4(B) (1974) codified the existing jurisprudence holding that minerals owned by the "state" could not be acquired by prescription since they could not be alienated. See, e.g., Shell Oil Company, supra. Additionally, the new constitution added that land and minerals could not be acquired from "a school board"[6] or "a levee district" by prescription. However, the framers of La. Const. art. IX, § 4 (1974) did not include these two specific public bodies in Section 4(A) providing that the "state" shall reserve its mineral interests.
Thus, the question of whether the Port Commission is the "state" for purposes of prescription under La. Const. art. IX, § 4(B) (1974) turns largely on whether the Port Commission is an "arm of the executive branch" type of state agency like a levee district or whether it is "a political corporation" or "political subdivision" of the state. The Port Commission contends that while it may be a political subdivision of the state, it is not a "local" political subdivision as characterized by the trial court. See Rycade Oil Corporation, supra at 305 (Tate, J. concurring).
The Port Commission was created by constitutional amendment by Act 504 of 1962, La. Const. art. VI, § 32 (1921) which was continued as a statute, La. R.S. 34:3158 through 3165 after the 1974 Constitution was adopted. La. R.S. 34:3158 provides that the Port Commission
A .... shall be composed of nine members, who shall serve without compensation and who shall be appointed for *1183 overlapping terms of six years as follows:
(1) One of the commissioners shall be appointed by the governing authority of the parish of Caddo.
(2) One of the commissioners shall be appointed by the governing authority of the parish of Bossier.
(3) Five of the commissioners shall be appointed by the governing authority of the city of Shreveport.
(4) Two of the commissioners shall be appointed by the governing authority of the city of Bossier City.
Louisiana R.S. 34:3160 sets forth the rights and powers of the Port Commission. Among these is the power to purchase and sell lands pursuant to its purpose of regulating commerce and traffic within the local geographic area of its authority. Importantly, the statute provides that "[t]itle to such property and improvements shall be in the public and shall vest in the commission for public administration, ..." (Emphasis added). Prior to its amendment in 1978, this particular provision read, "all property and improvements thereon shall vest in the state of Louisiana." 1978 Acts No. 316, Section 1, effective July 10, 1978. (Emphasis added).
Because the Port Commission is locally appointed by the municipal and parish authorities, it is clearly not an arm of the executive branch of state government. King, supra. If anything, it is an arm of local government. This conclusion is confirmed in La. Atty. Gen. Op. No. 81-713A wherein the opinion reaffirms its earlier Opinions 81-713 and 1026, that "all Port Commissions are `political subdivisions of the state' under the 1974 Constitution." 1981 WL 154727 (La.A.G.). Further reaffirming Opinion 81-713, the Attorney General opined that "Port Commissions were `local government entities, political subdivisions,' and not part of the `executive branch of government.'"
The legislative mandate of the Port Commission is to act in the interest of the public, and clearly the purpose of La. Const. art. IX, § 4 (1974) is to protect the public's ownership of state lands and minerals. See King, supra.
On the other hand, title to all lands acquired by the Port Commission is in the public and vests in the commission for public administration. Prior to 1978, La. R.S. 34:3160 provided that title "vested in the state of Louisiana." The 1978 amendment to La. R.S. 34:3160 expressly provides that title to land or property acquired by the Port Commission now vests in the commission. Hence, by implication, title is no longer vested in the state. The commission can be viewed as "a separate entity from the state, created by the state, it is true, to accomplish certain public purposes, but is nevertheless distinct from it." See Board of Commissioners of Caddo Levee District v. Pure Oil Co., 167 La. 801, 811, 120 So. 373, 377 (1929).
We also note that the record does not demonstrate that the Port Commission obtained land in question by transfer from the state to the Port Commission.[7] In Shell Oil Company, the land in question was acquired by the levee district directly from the state, whereas in Stokes, supra, the land was purchased by the school board from a private party. The Shell Oil Company court expressly noted that the state transferred the land in question to the levee district in determining that the land was still "state" land, and, by contrast, the Stokes court, distinguishing its case from earlier "levee district" cases, felt *1184 "constrained" to note that the Beauregard Parish School Board acquired the land by purchase from a private vendor.
Finally, we observe that the 1974 Constitution refers to political subdivisions in other parts of the Constitution and expressly defines "Political Subdivision" in Section 44(2) of Article VI as "... a parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions." Thus, a political subdivision, as a body of local government, is distinguished from the state in the 1974 Constitution itself.
Considering all these factors in light of the jurisprudence discussed above, including the rule of construction expressed in the phrase, "expressio unius est exclusio alterius," (the expression of one thing necessarily excludes the other things not expressed), we conclude that the term "state" in La. Const. art. IX, § 4(B) (1974) does not include the Caddo-Bossier Parish Port Commission. With the exception of "a school board" and "a levee district," the framers intended that the restriction or limitation on the running of prescription contained in that constitutional provision applies to the "state" only as a separate entity from its political subdivisions. Stokes v. Harrison, 109 So.2d 506, 510 (La.App. 1st Cir.1959).
Is the Port Commission a "Person" under La. R.S. 31:149?
We turn now to the question of whether the Port Commission is a "person" under La. R.S. 31:149.[8] This statute suspends the running of the prescription of nonuse against a mineral interest reserved by a "person" when the land is acquired by the United States, the State of Louisiana, or any subdivision or agency of either, or any legal entity with expropriation authority. The question in this case is whether the Port Commission qualifies as a "person" for purposes of the statute.
The Port Commission contends that it acted as a "person" pursuant to the statute when it sold the land to the Red River Waterway District, reserving the minerals pursuant to the statute. "Person," it argues, includes political corporations such as itself. Thus, prescription did not run against its servitude until the Waterway District sold the land to the Cowleys.
The term "person" in La. R.S. 31:149 (the Mineral Code) can be narrowly construed as signifying only "natural persons," or alternatively, can be broadly construed to include juridical entities such as corporations, partnerships and other entities to which the law ascribes personality, both public and private. Relying on language from the case of Aetna Casualty & Surety Co. v. Lively-Culpepper Chevrolet, 609 So.2d 1055 (La.App. 2d Cir.1992), the district court determined that it must seek the legislative purpose and history of La. R.S. 31:149 to determine the meaning of the word "person." The trial court held that the term "person," in its general usage, "does not include the State or its political subdivision; and even after analysis into the purpose, context and legislative history of the statute in question, it appears that it was not intended to constitute a "person" in the context of this case."
The Mineral Code does not define "person" for purposes of La. R.S. 31:149 or the Mineral Code as a whole, but it does specify that where the Mineral Code does not expressly or impliedly provide for a particular situation, the Civil Code applies. La. R.S. 31:2. The Mineral Code was adopted in 1975. At that time, former La. C.C. art. 3556(23) stated that the term "person," as *1185 a term of law employed in the Civil Code, "is applicable to men and women, or either." However, we think the plain meaning of this article, which is now repealed, is that the law applies with equal force to men and women alike when the term "person" is used, and the article should not be seen as providing a definition of the term "person" to mean only natural persons.
There is no definition of the term "person" per se in the code. The Civil Code today classifies persons into natural and juridical persons. La. C.C. art. 24 reads:
There are two kinds of persons: natural persons and juridical persons.
A natural person is a human being. A juridical person is an entity to which the law attributes personality, such as a corporation or a partnership. The personality of a juridical person is distinct from that of its members.
Comment (c) to the article states that:
According to civilian doctrine, juridical persons are classified either as private persons or public persons. A public person is governed by rules of public law... The state and its political subdivisions have dual personality. At times they act as public persons in a sovereign capacity and at times as private persons in the capacity of a citizen or a private corporation....
See also, City of New Orleans v. T.L. James & Company, 96-1112 (La.01/14/97), 685 So.2d 111.
In this instance, the Port Commission is clearly a juridical person possessing the same attributes of personality of most corporations. The Port Commission consists of nine members who act as a single body. The Port Commission is granted by La. R.S. 31:3160 various attributes of personality, among them the power to enter contracts, sell property, purchase property, enter service agreements and numerous other powers as a corpus in order to fulfill its purpose of regulating commerce and traffic on the river. Title to lands it purchases is vested in the Port Commission, not the state.
Regarding the land transaction in the instant case, the Port Commission sold a 340-acre tract to the Red River Waterway District, an entity with expropriation authority, reserving the minerals thereto pursuant to La. R.S. 31:149. The record does not demonstrate whether the Port Commission acquired the land in its capacity as a public person or in its capacity to act as a private person. See City of New Orleans, supra. Be that as it may, we conclude that when the Port Commission sold the tract in question, it was utilizing the attributes of personality conferred upon it by the legislature and acting as a juridical person such as a corporation.
The question, then, is whether La. R.S. 31:149 includes juridical persons such as Port Commissions. La. C.C. art. 9 provides:
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.
The ordinary meaning or definition of the term "person" in law is this: A person is any human being, corporation or body politic having legal rights and duties.[9]
The trial court obviously believed that it was required to investigate the history of the statute to find the purpose of the law in order to ascertain the meaning of the *1186 term "person," since the term "person" is susceptible of several meanings, including juridical persons as well as natural persons. La. C.C. art. 10. We do not agree that this approach is called for in this instance.
La. C.C. art. 10 requires that courts search for "the meaning that best conforms to the purpose of the law" when "the language of the law is susceptible of different meanings." In this instance, however, the language of La. R.S. 31:149 really has only one meaning which does not change whether the term "person" is construed to mean a natural or juridical person, or both. Thus, when a federal or state governmental entity or entity with expropriation authority acquires a tract of land from any person who reserves the minerals, the servitude thereby created shall be imprescriptible as long as the governmental entity or entity with expropriation authority owns it. The meaning of Section 149 does not change whether by "person" we mean a human being, corporation or body politic.
The Mineral Code is a body of law involving many terms of art and technical terms. These terms must be given their technical meaning when the law involves a technical matter. La. C.C. art. 11. It seems somewhat incongruous to ignore the ordinary legal sense of the word "person" in favor of its non-legal sense in a technical area of the law such as the law regarding reservation and prescription of mineral interests.
Lastly, although we do not consider it necessary in this case to look into the history and purpose of La. R.S. 31:149 to construe the term "person," our broad construction to include juridical persons is nevertheless bolstered by the statute's prior history and purpose. We have no doubt that the purpose of former La. R.S. 9:5806 was to enable the acquisition of land more easily by allowing landowners to keep the minerals for an indefinite time in the future. Humble Oil & Refining Co. v. Freeland, 216 So.2d 689 (La.App. 3d Cir.1968); see also, Guy E. Wall, 42 La. L.Rev. 123 (1981). As it was originally drafted, La. R.S. 9:5806 was aimed primarily at encouraging corporate, firm, and individual private landowners to sell large tracts of land for state use. However, when the legislature enacted La. R.S. 31:149 of the Mineral Code, it eliminated the terms "firm" and "corporation" contained in the source statute, La. R.S. 9:5906, and only the term "person" remained. The question is, does this narrow or broaden the meaning of the statute?
If the meaning of the term "person" is to be found in the statute's historical purpose, which was to make it easier for governing entities to obtain land from private landowners, then we must conclude that the legislature surely did not intend to confine the meaning of "person" in the statute to natural persons alone, so that the acquiring governmental entity could acquire land more easily only from landowners who were natural persons, while continuing to face difficulty in obtaining land from those owners who happen to be corporations.
Rather, we think that the purpose of leaving out "firms" and "corporations" was to eliminate redundancy, since "person" applies to natural and juridical persons, and to avoid a laundry list of entities to which the law now attributes personality, such as, e.g., the illustrative list of entities listed under the term "person" contained in La. C.C.P. art. 5251(12), which reads: "`Person' includes an individual, partnership, unincorporated association of individuals, joint stock company, corporation, or limited liability company."
Accordingly, we conclude that the term "person" in La. R.S. 31:149 is broad *1187 enough to include the Port Commission in this instance.

Conclusion
For these reasons, we conclude that the trial court erred in holding that the servitude reserved by the Port Commission prescribed for ten years' nonuse. We further render judgment in favor of the Port Commission and against the Cowleys, who are also assessed with the costs of this appeal.
REVERSED AND RENDERED.
NOTES
[1] The defendants are The Cowley Corporation, Argent Financial Group, Inc. and E.H. Turner, III, as Co-Trustees of The Kathryn C. Turner Testamentary Trust, Kathryn Nichols Cowley, Sheri Lynn Cowley Soulie, Susan A. Cowley Bantle, The Kathryn C. Turner Testamentary Trust, The Dorothy Colleen Cowley Trust and Dorothy Colleen Cowley LeBlanc.
[2] The pertinent parts of the statute provide:

§ 149. Mineral rights reserved from acquisitions of land by governments or agencies thereof imprescriptible
A. When land is acquired from any person by the United States or the state of Louisiana, or any subdivision or agency of either... by ... contract ... a mineral right otherwise subject to the prescription of nonuse is reserved, the prescription of nonuse shall not run against the right so long as title to the land remains in the government, or any of its subdivisions or agencies, or any legal entity with expropriation authority. (Emphasis added).
B.....
(3) If the land or any part thereof is transferred by the government, or subdivision, or agency, or legal entity ... to a private owner, the prescription of nonuse shall apply, as in the usual case, but shall commence only from the date on which the act of acquisition by the private owner is filed for registry.
[3] § 4. Reservation of Mineral Rights; Prescription

....
(B) Prescription. Lands and mineral interests of the state, of a school board, or of a levee district shall not be lost by prescription....
[4] Perhaps the most lucid expression of this policy is found in Chicago Mill & Lumber Co. v. Ayer Timber Co., 131 So.2d 635 (La.App. 2d Cir.1961), wherein the court opinion reads:

The landmark case of Frost-Johnson Lumber Co. v. Salling's Heirs, 1920, 150 La. 756, 91 So. 207, 239, is generally regarded as the original decision of our Supreme Court establishing the paramount rule of Louisiana mineral law that a mineral sale or reservation does not create a separate mineral estate, but only a right in the nature of a servitude subject to the liberative prescription of ten years. If restrictions had not been so imposed on the right to hold minerals out of commerce, as Justice O'Niell stated:
`* * * it would recognize a species of perpetual incumbrance upon real estate which has never yet found an abiding place in our civil law system.'
Six years before the Salling's Heirs case, supra, the Court in Bristo v. Christine Oil & Gas Co., 1916, 139 La. 312, 71 So. 521, struck down as being null a contract purporting to give a perpetual option to hold land under a mineral lease, on the ground that it:
`* * * would take the property out of commerce, and would be violative of the doctrine of ownership, defined in the second title of the second book of the Civil Code.' 139 La. at 315, 71 So. at 522. In the recent case of Gueno v. Medlenka, 1960, 238 La. 1081, 117 So.2d 817, the Supreme Court restated the basic principle as follows:
` * * * it is contrary to the public policy of this State to hold property out of commerce and this Court has consistently applied the liberative prescription of ten years in dealing with the exercise of mineral rights.' 238 La. at 1101, 117 So.2d at 824.
It is clear from the Salling's Heirs case, and later decisions, that Louisiana public policy is directed against the withdrawal of valuable property rights from commerce.
....
Almost every device conceivable has been employed in an attempt to circumvent our law on this question. In every instance where the Supreme Court has found such an intent it has zealously protected the State's public policy. This vigilance of the Supreme Court has curtailed the attempts of those who seek to withhold mineral rights from commerce beyond the prescriptive period. Chicago Mill & Lumber Co. v. Ayer Timber Co., 131 So.2d 635 (La.App. 2d Cir.1961).
See also, the court's discussion of cases regarding efforts by landowners to extend the life of the mineral servitude by stipulations in instruments: Bodcaw Lumber Co. of Louisiana v. Magnolia Petroleum Co., 1929, 167 La. 847, 120 So. 389; Union Producing Co. v. Parkes, D.C.W.D. La.1940, 40 F.Supp. 163; Vincent v. Bullock, 192 La. 1, 187 So. 35 (1939).
[5] Even though the Beauregard Parish School Board failed to reserve the minerals, it claimed that the reservation occurred by operation of law under Article IV, Section 2, and based on the jurisprudence, that its ownership of the minerals was imprescriptible. See, e.g., Shell Oil Company, supra.
[6] Although Stokes was a school board case, the court expressly noted that the issue of prescription was not reached. Stokes, supra at 381. The case involved the question of whether a school board was acting as the "state" when it sold land without reserving the minerals and was only indirectly concerned with prescription. The court held that the school board was not acting as the "state" for purposes of the constitutional prohibition against alienation of state minerals. Had the court ruled that the school board was the "state," the issue of imprescriptibility of state-owned minerals would have been raised. Accordingly, Section 4(B) limits the applicability of Stokes only to the issue of acquiring land or minerals from "a school board" by prescription, while at the same time tacitly codifies the jurisprudence distinguishing between "a school board" and the "state" as used in La. Const. art. IX, § 4(B) (1974).
[7] In fact, however, the Port Commission's deed from its vendor contains a mineral reservation in favor of a private vendor that has apparently prescribed.
[8] See note 1, supra at p. 1.
[9] Funk & Wagnall's Standard College Dictionary. New York: Harcourt, Brace & World. 1963.